T.C. Memo. 1999-381

UNITED STATES TAX COURT

FRANK W. GEORGE, Petitioner[1] v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 20868-97.                    Filed November 23, 1999.

Frank W. George, pro se.

Richard A. Rappazzo, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

COLVIN, Judge:  Respondent determined deficiencies in

petitioner's Federal income taxes of $24,295 for 1993 and $27,893

---

[1] This case was previously consolidated with Arivada Health
Enters. Trust v. Commissioner, docket No. 20657-97.  On the day
of trial, Arivada Health Enterprises Trust filed a petition in
bankruptcy.  As a result, we stayed all proceedings in Arivada
Health Enters. Trust and severed the cases.

for 1994, and accuracy-related penalties under section 6662(a) for negligence of $4,859 for 1993 and $5,578 for 1994.

In 1993, petitioner transferred his residence and medical practice to the Arivada Health Enterprises Trust (Arivada). Respondent determined that Arivada is a sham and lacks economic substance.

On October 19, 1998, petitioner filed a petition in the U.S. Bankruptcy Court for the District of Arizona. On October 20, 1998, respondent filed a motion to lift the automatic stay of Tax Court proceedings under 11 U.S.C. sec. 362(a)(8) (1994). On October 21, 1998, the bankruptcy court lifted the stay.

The issues for decision are:

1.   Whether we have jurisdiction to decide this case after the bankruptcy court lifted the stay on proceedings in the Tax Court. We hold that we do.

2.   Whether income received by the trust in the amount of $58,989 in 1993 and $78,772 in 1994[2] is included in petitioner's income. We hold that it is.

3.   Whether petitioner is subject to self-employment tax on income in the amount of $58,989 in 1993 and $78,772 in 1994 which he diverted to Arivada. We hold that he is.

---

[2] Respondent determined that petitioner failed to report in income $62,989 for 1993, but now concedes that petitioner reported $4,000 of this income for 1993.

4. Whether petitioner is liable for penalties for negligence under section 6662 for 1993 and 1994. We hold that he is.

Unless otherwise indicated, section references are to the Internal Revenue Code in effect during the years in issue. Rule references are to the Tax Court Rules of Practice and Procedure.

## I. FINDINGS OF FACT

### A. Petitioner

#### 1. Petitioner and Ms. Jones-George

Petitioner lived in Arizona when he filed his petition.

Petitioner and Jaye Jones-George (Jones-George) were married from September 1989 to June 1994. In 1993, they owned and lived in a residence in Scottsdale, Arizona (the Scottsdale residence). Petitioner was not married at the time of trial.

During 1993, petitioner had a personal bank account at the Bank of America.

#### 2. Petitioner's Medical Practice

Petitioner has a bachelor of science degree in Zoology from the University of Michigan and a Doctor of Osteopathy (D.O.) degree from the Chicago College of Osteopathic Medicine. He completed a residency in Biomechanics at Michigan State University.

At the time of trial, petitioner had been an osteopathic physician for 15 years and a homeopathic physician for 4 years.

He is licensed as an osteopathic physician by the States of Arizona and Ohio.  He is also licensed as a homeopathic physician by the State of Arizona.  During the years at issue, petitioner operated a medical practice at his Scottsdale residence and at other locations.

### 3.  Petitioner's Post Office Box

During the years at issue, petitioner had a post office box the address of which was 8711 E. Pinnacle Peak Road #121, Scottsdale, Arizona (the Pinnacle Peak address).  Petitioner had a key and access to the post office box at all times in 1993 and 1994.  Petitioner used the Pinnacle Peak address on his 1993 tax return and on checks from his checking account.

## B.  Stepping Stone Land Trust

On June 26, 1993, petitioner and Jimmy C. Chisum (Chisum) formed the Stepping Stone Land Trust[3] (Stepping Stone).  The trust agreement stated that petitioner was to transfer the Scottsdale residence to Stepping Stone.  He and Jones-George were named as the beneficiaries of the trust.  However, Jones-George did not participate in the trust and deeded her interest in the trust to petitioner sometime before June 26, 1993.

---

[3] Our use of the words "trust", "trust agreement", "trustee", "transferor", and "form" in our findings of fact does not necessarily indicate that we believe the transactions at issue have substance.

On November 10, 1993, Jones-George deeded to petitioner her one-half community property interest in the Scottsdale residence. On November 27, 1993, petitioner deeded the Scottsdale residence to Stepping Stone. Petitioner received 100 capital units in trust property for the residence.

Petitioner lived in the Scottsdale residence with Jones-George until she moved out late in 1993. Petitioner lived in the Scottsdale residence until it was sold after the years in issue. He paid the monthly mortgage on the residence both before and after he transferred the residence to Stepping Stone. He did not pay rent to, or have a lease or rental agreement with, Stepping Stone for the use of the residence. He did not use the Scottsdale residence differently after he transferred it to Stepping Stone.

C.  Arivada Health Enterprises Trust

1.  Formation of Arivada

Petitioner and Chisum met several times in 1992 and 1993. Chisum gave petitioner information about forming and using trusts. Arivada was formed on June 26, 1993. Chisum signed documents naming him trustee of Arivada beginning in 1993. Chisum was not an osteopathic or homeopathic physician.

Petitioner did not consult an accountant or attorney to discuss the validity of the trust before he entered into the trust agreement. Jones-George did not participate in the trust

because she was concerned about its tax implications, she did not trust Chisum, and she believed that Chisum would have control over their assets if she and petitioner transferred their assets to Arivada.

On August 5, 1994, petitioner assigned his interest in Stepping Stone to Arivada. Petitioner's use of the Scottsdale residence did not change after he transferred his interest in Stepping Stone to Arivada.

2. Operation of Arivada

Before Arivada was formed, petitioner operated a medical practice at his Scottsdale residence. After Arivada was formed, petitioner continued to operate his medical practice there just as he had done before Arivada was formed. There was no written employment contract between petitioner and Arivada.

Chisum did not make operational decisions for Arivada in 1993 and 1994. He did not schedule patients and made no decisions about petitioner's medical treatment of patients.

Arivada paid petitioner $4,000 in 1993 and $14,400 in 1994.

Chisum opened a checking account for Arivada at First Interstate Bank of Arizona (now known as Wells Fargo Bank) on July 14, 1993 (the "Arivada checking account" or "Arivada account"). Arivada used the Pinnacle Peak address on its checks. Petitioner kept the checkbook for the Arivada account in his briefcase. Petitioner and Chisum each had a stamp bearing

Chisum's signature. Chisum had signature authority over the Arivada account, but petitioner had Chisum's permission to use the signature stamp on checks petitioner wrote on the account. Petitioner wrote all of the checks from the Arivada account during 1993 and 1994. He (and occasionally Chisum) signed them with a stamp bearing Chisum's signature. Petitioner paid personal expenses such as his mortgage, home repairs, homeowners security fees, auto registration, auto insurance, auto service, tires, a magazine subscription, and utility bills from the Arivada account.

Petitioner did not pay rent to Arivada to live in the Scottsdale residence. He had no lease or rental agreement with Arivada to use the residence.

Before Arivada was formed, petitioner paid for water and sewage expenses of the Scottsdale residence from his checking account. After Arivada was formed, petitioner paid for the water and sewage expenses of the Scottsdale residence from the Arivada account.

After Arivada was formed, petitioner told the clinics for which he provided services[4] and other payers to pay Arivada rather than petitioner.

_____

[4] Chisum and petitioner testified that in 1993 Chisum contacted two of the clinics for which petitioner provided services purportedly to establish contracts between Arivada and them. The payers testified, however, that petitioner told them to pay Arivada. We find the payers' testimony credible.

3.   Arivada's Tax Returns

Arivada filed Forms 1041, U.S. Fiduciary Income Tax Return,[5] for 1993 and 1994.  Arivada's 1993 and 1994 tax returns report that Arivada was a simple trust.  Arivada used the Pinnacle Peak address on its 1993 and 1994 trust returns.  Arivada reported petitioner's medical income and expenses on its 1993 and 1994 returns.

Arivada attached a Schedule K-1 to its 1993 trust return. In it, Arivada reported that it had distributed $16,826 (all of its distributable net income) to a beneficiary named East Point. Arivada attached two Schedules K-1 to its 1994 trust tax return. Arivada reported that it had distributed $32,000 (80 percent of its distributable net income) to East Point, and $8,000 (20 percent of its distributable net income) to an entity called S A Finance.  Arivada provided no employee identification number on the Schedules K-1 for East Point or S A Finance.  Instructions for Form 1041, Schedule K-1, state:

> payers of income are "required under section 6109 to request and provide a proper identifying number for each recipient of income.  Enter the beneficiary's number on the respective Schedule K-1 when you file Form 1041."

Arivada filed a petition in bankruptcy on the day the trial in this case was set to begin.

---

[5] The Form 1041 for 1994 was called U.S. Income Tax Return for Estates and Trusts.

D.    Petitioner's Medical Employers in 1993 and 1994

     1.    Clinic Physicians Group, P.C.

During 1993, petitioner was a doctor on the staff of Clinic Physicians Group, P.C. (CPG).  Peggy McGarey (McGarey) was the office manager for CPG.  She prepared and signed payroll checks for CPG.

During the first part of 1993, CPG paid petitioner for his services with checks payable to Frank W. George.  McGarey gave the checks to petitioner by putting them in his desk drawer at CPG.  Petitioner endorsed most of the checks and deposited them in his bank account at the Bank of Arizona.

In the middle of 1993, petitioner told McGarey to make all of petitioner's checks payable to Arivada.  McGarey did so.  The checks were paid to Arivada to compensate petitioner for the services he rendered for CPG.  Petitioner's services for CPG did not change after CPG began making his checks payable to Arivada. McGarey gave the checks to petitioner by putting them in his desk drawer at CPG.  Petitioner endorsed most of the CPG checks made payable to Arivada and deposited them in Arivada's checking account.

     2.    Accutrace Laboratories, Inc.

During 1993 and 1994, petitioner was a clinical consultant for Accutrace Laboratories, Inc. (Accutrace).  Kenneth P. Eck (Eck) owns Accutrace.

On February 15, 1993, petitioner and Eck entered into an agreement under which Accutrace would pay petitioner $200 per month for petitioner's clinical consulting services. Early in 1993, Accutrace paid petitioner each month for his services by mailing checks payable to petitioner at the Pinnacle Peak address. Petitioner endorsed and deposited them in his bank account at the Bank of Arizona.

In the middle of 1993, petitioner told Eck to make the checks payable to Arivada and to make any contractual arrangements through Arivada. From July 1993 to June 1994, Accutrace paid petitioner for his services by mailing checks payable to Arivada at the Pinnacle Peak address. Petitioner endorsed the Arivada checks by writing or stamping "for deposit only, Arivada Health Enterprises". Petitioner then deposited them in Arivada's checking account.

There were no changes in how Eck or Accutrace did business with petitioner after Arivada was formed. After Eck began making Accutrace's checks payable to Arivada neither petitioner nor anyone acting for him or Arivada entered into a new agreement with Accutrace or Eck. The original agreement between petitioner and Accutrace was never changed.

3. DSD International

Dolores Eidenier (Eidenier) is the president and owner of DSD International (DSD), a vitamins and supplements wholesaler.

During 1993 and 1994, petitioner did business with, and was paid by, DSD. Beginning in March 1993, DSD paid petitioner based on the number of patients he referred to DSD. DSD made checks payable to petitioner, and he endorsed them and deposited them in his bank account at the Bank of Arizona.

In the middle of 1993, petitioner called Eidenier and told her to make his checks payable to Arivada. From August 1993 to July 1994, DSD paid petitioner for referring patients to DSD with checks payable to Arivada. Petitioner endorsed the DSD checks made payable to Arivada and deposited them in Arivada's account.

4.   The Cave Creek Clinic

Petitioner opened a clinic in Cave Creek, Arizona, during the years in issue. Elaine Jones (Jones) worked for petitioner at the clinic.

Arivada occasionally received mail at the Cave Creek clinic. Jones opened it and put it on petitioner's desk. Petitioner ran the Cave Creek clinic and was there every day. Chisum did not run the clinic and was there only occasionally.

5.   Doctors on Call, Inc.

Petitioner performed medical services for, and was paid by, Doctors on Call, Inc. (Doctors on Call), in Las Vegas, Nevada, during the years at issue. Dr. Tom Lodi (Lodi) was petitioner's supervisor at Doctors on Call. Petitioner told Lodi to make his checks payable to Arivada.

E.    Petitioner's Income Tax Returns

Petitioner and Jones-George filed joint income tax returns for 1991 and 1992.  They attached a Schedule C for petitioner's medical practice to their 1991 and 1992 returns.  On it, petitioner reported that his business address was located at the Scottsdale residence.  Petitioner reported that his medical income was self-employment income, and paid self-employment tax with his 1991 and 1992 returns.

Petitioner filed his 1993 income tax return (Form 1040) on August 11, 1994.  Petitioner and Jones-George filed separately for 1993 because she believed that Arivada was not a valid trust.

Petitioner attached a Schedule C for his medical practice to his 1993 return.  On it, he reported that he had $68,943 of gross income, consisting of $900 from Accutrace, $14,138 from Clinic Physicians Group, P.C., $49,905 from Doctors on Call, Inc., and $4,000 from Arivada.

Petitioner filed his 1994 income tax return on July 18, 1995.  He attached a Schedule C for his medical practice.  On it, petitioner reported that he had $15,136 of gross income, consisting of the following:  $736 from Cigna Healthcare Benefits, Inc., and $14,400 from Arivada.

F.    Notice of Deficiency

On July 15, 1997, respondent issued a notice of deficiency to petitioner for 1993 and 1994.  Respondent determined that

Arivada was a sham and that it lacked economic substance, and therefore that the amounts paid to Arivada of $62,989 for 1993 and $78,772 for 1994 are taxable income to petitioner.

## II.  OPINION

### A.  Procedural Issues

#### 1.  Whether Petitioner Was Denied an Opportunity To Conduct Discovery

Petitioner contends that he did not have enough time to conduct discovery because the case was being considered by the IRS Appeals Office until 20 days before the session for which the case was set for trial.  We disagree.  The fact that petitioner's case was being considered by Appeals did not limit his ability to seek discovery.  Rule 70(a)(2).

#### 2.  Whether We Have Jurisdiction After the Bankruptcy Court Lifted the Automatic Stay

On the first day of the session of this Court at which this case was calendared for trial, petitioner filed a petition for relief under chapter 13 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Arizona.  Once a taxpayer files a petition in bankruptcy, the automatic stay of 11 U.S.C. section 362(a)(8) (1994) bars the commencement or continuation of proceedings against the debtor in the Tax Court. The bankruptcy court may lift the automatic stay of 11 U.S.C. section 362(a)(8) (1994).  See 11 U.S.C. sec. 362(d), (e), and (f) (1994).  The next day, respondent filed a motion to lift the

automatic stay.  One day later, the bankruptcy court lifted the automatic stay.

Petitioner contends that we lack jurisdiction over this case because the lifting of the stay by the bankruptcy court was void. Petitioner contends that respondent lacked standing to seek the lifting of the automatic stay, and that he had insufficient service of respondent's motion in the bankruptcy court to lift the stay.  We disregard petitioner's arguments because petitioner may not collaterally attack the bankruptcy court's proceeding in this Court.  See Shaheen v. Commissioner, 62 T.C. 359, 364-365 (1974); Roberson v. Commissioner, 41 T.C. 577, 581 (1964). Petitioner's claim that we lacked jurisdiction to hold the trial lacks merit.  See Noli v. Commissioner, 860 F.2d 1521, 1525 (9th Cir. 1988) (the Tax Court may resume proceedings after the bankruptcy court orders the lifting of the automatic stay).

B.    Whether Arivada Is a Trust for Federal Tax Purposes

    1.    Whether Respondent Bears the Burden of Proof

Petitioner contends that respondent bears the burden of proof because respondent's determination was a "naked assessment".  Petitioner cites United States v. Janis, 428 U.S. 433, 441-442 (1976); Portillo v. Commissioner, 932 F.2d 1128, 1133 (5th Cir. 1991); and Weimerskirch v. Commissioner, 596 F.2d 358, 360 (9th Cir. 1979).  Petitioner's reliance on these cases is misplaced.  The Courts in those cases held that the

Commissioner determined that the taxpayer had unreported income without substantive evidence linking the taxpayer to the income. See United States v. Janis, supra at 437, 441; Portillo v. Commissioner, supra at 1133-1134; Weimerskirch v. Commissioner, supra at 361-362. Here, there is evidence clearly linking petitioner to the income he diverted to Arivada. Thus, the notice of deficiency is presumed to be correct, and the burden is on petitioner to rebut this presumption. See Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933).

2. Whether Arivada Was a Sham and Lacked Economic Substance

Respondent contends that Arivada should not be recognized for Federal income tax purposes because it is a sham and lacked economic substance. Petitioner contends that Arivada is not a sham.

A trust which lacks economic substance and has no purpose other than tax avoidance is not recognized for Federal tax purposes. See Neely v. United States, 775 F.2d 1092, 1094 (9th Cir. 1985); Zmuda v. Commissioner, 731 F.2d 1417, 1421 (9th Cir. 1984), affg. 79 T.C. 714 (1982); Markosian v. Commissioner, 73 T.C. 1235, 1245 (1980); Furman v. Commissioner, 45 T.C. 360, 364 (1966), affd. per curiam 381 F.2d 22 (5th Cir. 1967). Petitioner presented no credible evidence that Arivada had economic substance or was formed for any reason other than tax avoidance.

The Courts generally will not recognize a trust for Federal tax purposes if the grantor keeps substantially unfettered powers of disposition or beneficial enjoyment of trust property.  See United States v. Noske, 117 F.3d 1053, 1059 (8th Cir. 1997); Paulson v. Commissioner, 992 F.2d 789, 790 (8th Cir. 1993), affg. per curiam T.C. Memo. 1991-508; United States v. Buttorff, 761 F.2d 1056, 1061 (5th Cir. 1985); Schulz v. Commissioner, 686 F.2d 490, 495 (7th Cir. 1982), affg. T.C. Memo. 1980-568; Vnuk v. Commissioner, 621 F.2d 1318, 1320-1321 (8th Cir. 1980), affg. T.C. Memo. 1979-164.  Petitioner dealt with the alleged trust property as if it were his own.  He continued to live in the Scottsdale residence.  He did not change how he conducted his medical practice.  He controlled Arivada's checking account, kept the checkbook, and wrote the checks on the account.  There is no evidence that Chisum wrote or signed any checks on the account.

Petitioner contends that Chisum controlled Arivada and managed the financial aspects of petitioner's medical practice during the years in issue.  We disagree.  Petitioner's and Chisum's testimony was evasive and vague.  We need not accept self-serving testimony if we find it to be unworthy of belief, Geiger v. Commissioner, 440 F.2d 688, 689-690 (9th Cir. 1971), affg. per curiam T.C. Memo. 1969-159; Tokarski v. Commissioner, 87 T.C. 74, 77 (1986).  Petitioner offered no documentary evidence showing that Chisum provided services to Arivada.

Chisum did not schedule patients or decide how to treat them. Petitioner and Chisum testified that Chisum changed the philosophy of petitioner's medical practice, but neither identified any specific changes or decisions that Chisum made. Petitioner and Chisum testified that Chisum met with Yuma Urgent Care and Doctors on Call on behalf of Arivada. However, petitioner offered into evidence no contracts that Arivada had with Yuma Urgent Care or Doctors on Call, and no representative of either entity testified at trial.

Petitioner contends that he used Arivada checks only to pay Arivada's expenses, that he did not use the stamp on checks for personal expenses, and that his use of Chisum's stamp and possession of Arivada's checkbook does not mean he controlled the income. We disagree. Petitioner paid personal expenses such as his mortgage, home repairs, homeowners security fees, auto registration, auto insurance, auto service, tires, a magazine subscription, and utility bills from the Arivada account.

Petitioner contends that Arivada had economic substance because he purportedly gave legal title to the Scottsdale residence and petitioner's medical practice to Arivada and Chisum as its trustee. We disagree. The fact that petitioner put the title to the Scottsdale residence in Arivada's name does not imbue Arivada with economic substance, particularly when petitioner treated the residence as his own. Also, we are not

convinced that Arivada or Chisum had legal title to petitioner's business.

Petitioner contends that East Point and S A Finance are beneficiaries of Arivada and that an economic interest passed to them from Arivada. The record does not support his contention. Petitioner did not offer any credible evidence showing that East Point had a beneficial or economic interest in Arivada in 1993 or 1994, that East Point's alleged beneficial interest in Arivada changed from 100 percent in 1993 to 80 percent in 1994, that S A Finance had a beneficial interest in Arivada in 1994, that East Point and S A Finance had employer identification numbers, or that Arivada distributed to East Point or S A Finance any money or property as a result of this beneficial interest.

Jones-George believed that Chisum could control those assets if she and petitioner transferred them to Arivada. However, the fact that she believed the trust would have substance does not mean that it did.

3.  <u>Whether Arizona Law Determines Whether Arivada Is a Sham for Federal Tax Purposes</u>

Petitioner contends that, under sections 643, 651, and 652 of the Internal Revenue Code, Arizona law controls whether Arivada is a sham for Federal tax purposes. Petitioner contends that, under Arizona law, the person claiming that the trust or other entity is not valid bears the burden of proof. We disagree that Arizona law controls here. We need not recognize an entity

for Federal tax purposes even if it is valid under State law. See <u>Gregory v. Helvering</u>, 293 U.S. 465, 469 (1935); <u>Neely v. United States</u>, 775 F.2d at 1094; <u>Zmuda v. Commissioner</u>, 731 F.2d 1417, 1421 (9th Cir. 1984), affg. 79 T.C. 714 (1982).

4.  <u>Petitioner's Other Contentions</u>

Petitioner contends that he is not liable for tax on amounts paid to Arivada unless respondent proves that Arivada is the transferee of petitioner under section 6901.  Petitioner also contends that we may consider whether, under the Federal Debt Collection Act (FDCA), 28 U.S.C. sections 3001-3015, and the Federal Fraudulent Transfers Act (FFTA), 28 U.S.C. sections 3301-3308, Arivada is a transferee of petitioner.  We disagree.  These authorities are irrelevant to the issues before us.

Petitioner contends that Chisum had the only copy of the Arivada trust instrument and that petitioner was prejudiced by the Court's severing of petitioner's case from Arivada's on the morning of trial and the day that Arivada filed a petition in bankruptcy.  Petitioner contends that he could not have compelled Chisum to produce the trust instrument absent a subpoena and that he had insufficient time to do so after the Court severed the two cases.  Petitioner's contention assumes that Chisum would not cooperate voluntarily with him; petitioner did not make that showing.  On the contrary, it appears from the record that they were cooperating fully.

Petitioner argues that his and Chisum's testimony establishes that the trust exists since they both testified that it exists.  Our conclusion is not altered by that testimony because petitioner's operation of Arivada shows that it was a sham.

Petitioner contends that respondent improperly determined that both Arivada and petitioner had a deficiency based on the same income.  We disagree.  The Commissioner may determine as protective positions that the same income was received by different taxpayers.  See  Malat v. Commissioner, 302 F.2d 700, 706 (9th Cir. 1962), affg. 34 T.C. 365 (1960); Doggett v. Commissioner, 66 T.C. 101, 103 (1976).

5.   Conclusion

We do not recognize Arivada as a trust for Federal income tax purposes.  The only purpose for the transfer of property to the trust was tax avoidance.[6]  The money paid to it is taxable income to petitioner.  See Rule 142(a).

---

[6] Petitioner testified that he established Arivada to benefit his disabled child, to protect assets, and to limit his malpractice liability.  Petitioner did not argue on brief that he had nontax reasons for establishing the trust.  We treat this as petitioner's abandonment of this contention.  See Sundstrand Corp. v. Commissioner, 96 T.C. 226, 344 (1991); Foil v. Commissioner, 92 T.C. 376, 409 (1989), affd. 920 F.2d 1196 (5th Cir. 1990).  Petitioner's testimony about the alleged bona fides of Arivada was not credible in any event.

C.    Self-Employment Income

Respondent determined that petitioner is liable for self-employment tax on the income petitioner diverted to Arivada in 1993 and 1994.  Section 1401 imposes a tax on an individual's self-employment income.  Self-employment income is the net earnings derived by an individual from any trade or business carried on by that person.  See sec. 1402(a) and (b).

Petitioner contends that he had no self-employment income because Arivada is a trust for Federal tax purposes.  We disagree.  Petitioner earned income by providing services to patients.  Petitioner treated the income from his practice as self-employment income on his 1991 and 1992 returns.  He did not substantially change how he conducted his practice after Arivada was formed.  The payments that he diverted to Arivada are subject to self-employment tax.  See sec. 1402(a).  Thus, petitioner is liable for self-employment tax on income he diverted to Arivada ($58,989 in 1993[7] and $78,772 in 1994).

---

[7] As a result of respondent's concession that petitioner had less income for 1993 than determined, petitioner's self-employment tax liability for 1993 will be less than determined in the notice of deficiency.

D.   Whether Petitioner Is Liable for Accuracy-Related Penalties for 1993 and 1994

Respondent determined that petitioner is liable for accuracy-related penalties for negligence under section 6662(a) for 1993 and 1994.

Taxpayers are liable for a penalty under section 6662 equal to 20 percent of the part of the underpayment which is attributable to negligence.  See sec. 6662(a).  For purposes of section 6662(a), negligence is a failure to make a reasonable attempt to comply with the Internal Revenue Code.  See sec. 6662(c).  The accuracy-related penalty under section 6662(a) does not apply to any part of an underpayment if the taxpayer shows that there was reasonable cause for that part of the underpayment and that the taxpayer acted in good faith based on the facts and circumstances.  See sec. 6664(c)(1).  A taxpayer may establish that he or she had reasonable cause and was not negligent under section 6662(a) by proving that he or she reasonably relied in good faith on the advice of a competent, independent expert or tax professional possessed of all the information.  See United States v. Boyle, 469 U.S. 241, 250 (1985); Leonhart v. Commissioner, 414 F.2d 749, 750 (4th Cir. 1969), affg. T.C. Memo. 1968-98; Ewing v. Commissioner, 91 T.C. 396, 423 (1988), affd. without published opinion 940 F.2d 1534 (9th Cir. 1991).

Petitioner contends that he is not liable under section 6662(a) because he relied on Chisum.  We disagree.  Chisum claims

that he is a consultant on establishing and operating trusts. Chisum is neither an attorney nor an accountant. There is no evidence that petitioner investigated Chisum's qualifications. A taxpayer must make reasonable inquiry as to the legality of a tax plan, including obtaining independent legal advice, when it is common knowledge that the plan is questionable. See Neely v. United States, 775 F.2d at 1095; Hanson v. Commissioner, 696 F.2d 1232, 1234 (9th Cir. 1983), affg. T.C. Memo. 1981-675 (taxpayers who established family trust that was lacking in economic substance were negligent in putting their faith in "flagrant tax avoidance scheme" repeatedly rejected by the courts). Petitioner negligently disregarded the tax laws. We conclude that petitioner is liable for accuracy-related penalties for negligence under section 6662(a) for 1993 and 1994.

To reflect the foregoing,

Decision will be entered
under Rule 155.